UNITED STATES DISTRICT COURT
DISTRICT OF NEW MEXICO

ART SCHAAP AND RENEE SCHAAP d/b/a
HIGHLAND DAIRY,

    *Plaintiff,*

*-against -*

3M COMPANY, f/k/a Minnesota Mining and
Manufacturing Co., BUCKEYE FIRE EQUIPMENT
COMPANY, CHEMGUARD, INC., TYCO FIRE
PRODUCTS L.P., NATIONAL FOAM, INC., E.I DU
PONT DE NEMOURS AND COMPANY, THE
CHEMOURS COMPANY L.L.C. and THE
CHEMOURS COMPANY FC, LLC, individually and
as successors in interest to DuPont Chemical Solutions
Enterprise,

    *Defendants.*

COMPLAINT

Case No:

**JURY TRIAL
DEMANDED**

Plaintiffs, Art Schaap and Renee Schaap d/b/a Highland Dairy (hereinafter "Plaintiff"),

by and through its attorneys NAPOLI SHKOLNIK PLLC and DOERR & KNUDSON, PA, as

and for its Complaint against Defendants 3M Company, f/k/a Minnesota Mining and

Manufacturing Co., Buckeye Fire Equipment Company, Chemguard, Inc., Tyco Fire Products

L.P., National Foam, Inc., E. I. Du Pont De Nemours and Company, The Chemours Company

L.L.C., and The Chemours Company FC, L.L.C., individually and as successors in interest to

DuPont Chemical Solutions Enterprise (collectively "Defendants"), alleges as follows:

## INTRODUCTION

1.    Plaintiff, the Highland Dairy (hereinafter "Highland" or "Dairy"), brings this

action against 3M Company, f/k/a Minnesota Mining and Manufacturing Co., Buckeye Fire

Equipment Company, Chemguard, Inc., Tyco Fire Products L.P. (successor-in-interest to Ansul

Co.), National Foam, Inc. E. I. Du Pont De Nemours and Company, The Chemours Company

L.L.C., and The Chemours Company FC, L.L.C., individually and as successors in interest to DuPont Chemical Solutions Enterprise, to recover past and future damages caused by the contamination of its groundwater supply by per- and polyfluoroalkyl substances ("PFAS"), including but not limited to perfluorooctanoic acid ("PFOA") and/or perfluorooctane sulfonic acid ("PFOS").

2.     Plaintiff has been significantly damaged in its business and property as a direct and proximate result of the Defendants' conduct, as set forth herein. The PFAS contamination proximately caused by Defendants has lead to terminated permits and contracts, lost value of the business and its assets, including but not limited to the ability to sell milk and cows for beef, and has resulted in significant lost revenue and profits, thereby permanently damaging Plaintiff's business.

3.     Defendants 3M Company, f/k/a Minnesota Mining and Manufacturing Co., Buckeye Fire Equipment Company, Chemguard, Inc., Tyco Fire Products L.P. (successor-in-interest to Ansul Co.), National Foam, Inc., E. I. Du Pont De Nemours and Company, The Chemours Company L.L.C., and The Chemours Company FC, L.L.C., individually and as successors in interest to DuPont Chemical Solutions Enterprise (collectively referred as AFFF Manufacturers) manufactured, marketed, and sold aqueous film-forming foam ("AFFF") and/or the PFAS constituents of AFFF, a firefighting product used to control and extinguish aviation, marine, fuel, and other flammable liquid fires, that was used in areas around the Highland Dairy and that eventually contaminated the groundwater to which Plaintiff had a right.

4.     The AFFF Manufacturers' product contained PFOA and PFOS and/or contained the precursors of PFOS and PFOA. PFOA and PFOS are toxic, do not biodegrade, are persistent

2

in the environment, move easily through soil and groundwater, absorb into concrete, and pose a significant risk to human health and safety.

5. PFOA and PFOS are associated with a variety of illnesses, including but not limited to kidney cancer, testicular cancer, ulcerative colitis, thyroid disease, pregnancy induced hypertension (including preeclampsia), and hypercholesterolemia. The chemicals are particularly dangerous for pregnant women and young children. Defendants were aware since the 1960's and 70's that PFOA and PFOS were toxic, do not biodegrade, are persistent in the environment, move easily through soil and groundwater and pose a significant risk to human health and health and safety, but elected to use these chemicals and not warn their customers, placing profits over human health.

## 3M's AFFF PRODUCTION

6. In the early 1960's, 3M and the United States Naval Research Laboratory developed AFFF to extinguish jet fuel fires, which are largely impervious to water, by smothering them. 3M's AFFF, which is produced through a 3M process called electrochemical fluorination ("ECF"), contained PFOS.

7. 3M is the only manufacturer who used the ECF process, and therefore, produced the only AFFF that contained PFOS, as opposed to PFOA.

8. Therefore, if PFOS is identified at a site where AFFF was used, the AFFF is a 3M product. Other formulations of AFFF manufactured by the non-3M Defendants are synthesized through telomerization and contain PFOA, but not PFOS. However, PFOS can be present in the final AFFF product manufactured by a non-3M Defendant through the manufacturing process where trace amounts have accumulated on the manufacturing equipment through legacy use of PFOS.

3

10.     Upon information and belief, instructions, labels and material safety data sheets were provided with the AFFF by Defendants which, for significant time periods, did not fully describe the health and environmental hazards of AFFF which Defendants knew or should have known at the time of distribution.

11.     Upon information and belief, Defendants knew of these health and environmental hazards for years yet failed to warn the users and other sensitive receptors, such as public water providers and food and agricultural organizations such as Plaintiff.

12.     Defendants voluntarily elected to include PFOA and/or PFOS in their AFFF.

**MANUFACTURERS' AFFF LEADS TO NATIONWIDE CONTAMINATION**

13.     Civilian and military airports, fire departments and industrial facilities, unaware of the environmental and health risk and hazards of using Defendants' AFFF, used AFFF containing PFOA and PFOS for decades for firefighting and training. These sites have been linked to the widespread contamination of surface and groundwater, as well as public drinking water wells, with PFOA, PFOS, and other PFAS throughout the country.

14.     Defendants' AFFF has been used for almost 50 years at the Cannon Air Force Base ("CAFB"). During routine training exercises, AFFF has been sprayed directly on the ground and/or tarmac at several fire training areas, allowing PFOA/PFOS to travel to the surrounding groundwater, causing contamination of Highland's water supply wells, in various locations, in varying amounts, at various times.

15.     In addition to routine training for personnel, additional releases of AFFF have occurred at CAFB through testing of the equipment, false alarms, equipment malfunctions, and other incidental releases in the hangers, fire stations and other locations.

4

16.     Once the Defendants' AFFF was released into the environment, whether on the ground, into the air, or through a wastewater treatment system, the PFOS/PFOA from CAFB eventually contaminated Highland's water supply that was provided directly to Plaintiff's residences, livestock, as well as irrigation wells used to water the crops that were grown to feed Plaintiff's livestock for decades.

17.     There is no natural sink for the Manufacturing Defendants' AFFF containing PFOS and PFOA. Except for incineration above 10,000 degrees, Defendants' PFOS and PFOA will eventually accumulate in the water and all living organisms - including the blood and organs of humans and livestock.

18.     Defendants knew or should have known that PFOA and PFOS are highly soluble in water, extremely mobile, persistent, and very likely to contaminate drinking water wells and present significant risks to human health and welfare if released into the environment.

19.     Nevertheless, Defendants manufactured, marketed, and sold their AFFF with the knowledge that PFOS and PFOA would be released into the environment in firefighting training and rescue exercises, inadvertent releases, false alarms, as well as in emergencies.

20.     Plumes of PFOA and PFOS can persist in underground aquifers for many decades. Once the plume reaches a well, it continues to contaminate the water drawn from that well.

21.     Highland Dairy brings this action to recover damages incurred and to be incurred by Highland in investigating, monitoring, remediating, treating and otherwise responding to the PFOA/PFOS water contamination to stem the threat to their products, including milk, beef, cattle and crop production caused by Defendants' AFFF products, and ensure the damages are borne by those responsible; not Highland Dairy.

5

## PFAS CHEMICAL MANUFACTURERS

22.     Defendants marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, sold, and/or otherwise handled and/or used PFAS, PFOA, PFOS and/or PFASs in their AFFF.

23.     PFAS chemicals manufactured and released into the environment by the PFAS Chemical Manufacturers and into Plaintiff's water supply include, but are not limited to Perfluorobutanesulfonic acid (PFBS), Perfluorohexanesulfonic acid (PFHxS) and Perfluorononanoic acid (PFNA), which are all man-made PFAS chemicals.

24.     Since June 2003, 3M has used Perfluorobutanesulfonic acid or PFBS as a replacement for the persistent, toxic, and bioaccumulative perfluorooctanesulfonic acid (PFOS) in its Scotchgard stain repellents.

25.     Perfluorohexanesulfonic acid or PFHxS is part of the group of Perfluorochemicals (PFASs). Other well-known members of PFASs include PFOS and PFOA. PFHxS, PFOS and PFOA share similar chemical structure and uses (i.e, surface treatment agents for textiles, paper, and furniture etc. for its excellent waterproofing and oil-resistance performance). PFHxS have been detected in endangered species and the human blood of the general population. It has long-range transport potential and higher bioaccumulation in humans than PFOS.

26.     Perfluorononanoic acid, or PFNA, is a synthetic perfluorinated carboxylic acid and fluorosurfactant that is also an environmental contaminant found in people and wildlife along with PFOS and PFOA.

27.     Perfluorochemicals (PFASs) are a group of chemicals used to make fluoropolymer coatings and products that resist heat, oil, stains, grease, and water. Fluoropolymer coatings can be used in such varied products as clothing, furniture, adhesives,

6

food packaging, heat-resistant non-stick cooking surfaces, and the insulation of electrical wire. Many chemicals in this group, including perfluorooctane sulfonic acid (PFOS) and perfluorooctanoic acid (PFOA), have been a concern because they do not break down in the environment, and they build up in wildlife. PFASs have been found in rivers and lakes and in many types of animals on land and in the water.

28.     Like other ground water contaminants, PFASs that are released to the environment can reach drinking water wells via the well-established pathway of migration of a ground water plume that has been contaminated either directly from surface spills or by contaminated surface water mixing with ground water drawn in by pumping wells.

29.     Sources of human exposure to PFASs include drinking water, food, food packaging, carpets, upholstery, and clothing treated for water and stain resistance, house dust, protective sprays and waxes, and indoor and outdoor air.

30.     Defendants knew or should have known that PFASs are highly soluble in water, extremely mobile, persistent, and very likely to contaminate drinking water wells and present significant risks to human health and welfare if released into the environment.

31.     Nevertheless, Defendants marketed, developed, manufactured, distributed, released, trained users, produced instructional materials, sold and/or otherwise handled their products with the knowledge that PFASs would be released into the environment reaching rivers, lakes, groundwater, soil, wells and/or aquifers.

32.     Plumes of PFASs can persist in underground aquifers for many decades. Once the plume reaches a well, it continues to contaminate the water drawn from that well. The most viable technologies to remove PFASs from the groundwater are granulated activated carbon ("GAC"), reverse osmosis, and ion exchange.

33.     Highland Dairy brings this action to recover damages incurred and to be incurred by Highland proximately caused by the PFASs/PFOA/PFOS water contamination.

## THE PARTIES

### Highland Dairy

34.     Plaintiff, Highland Dairy, has its principal place of business located at 650 Curry Road O, Clovis, NM 88101. Highland sits directly to the south and slightly to the east of the Cannon Air Force Base ("CAFB").

35.     Highland is owned and operated by Art and Renee Schaap which has approximately 1,800 dairy cattle and 5,000 other head of cattle, including calves.

36.     Highland has been operating for about 32 years since it was founded in about 1987 and generates about $2.6 million in annual revenues and employs approximately 40 people.

37.     Mr. Schaap noticed a decline in the milk production at Highland Dairy and has brought in various nutritionists and other experts in an attempt to help him determine why his cattle were producing approximately 10 pounds of milk per day less than normal.

38.     Mr. Schaap never considered water contamination as a possible source of that decline in milk production, which has now resulted in an over one million dollars annual loss for several years.

39.     On or about August 24th, 2018, Mr. Schaap, along with other property owners adjacent to CAFB, received a letter from the base advising that the Air Force would be sampling wells for the presence of PFAS contamination in and around CAFB. Prior to this date Mr. Schaap had never heard of PFOS, PFAS or PFAS.

40.     A couple weeks later, the Air Force by letter dated September 13th, 2018 notified Mr. Schaap that testing at his wells from samples recovered on August 24th, 2018 had

8

detected PFOA and PFOS in Plaintiff's wells at a combined concentration at Site 1 of 1,649 parts per trillion (ppt) and at Site 2 of 671 ppt, respectively. These results are more than 23 times and 9 times EPA's Health Advisory levels.

41.     Thereafter, CAFB committed to provide one gallon of bottled water per resident per day, but offered no substitute water supply for Mr. Schaap's dairy operation at Highland.

42.     On October 5th, 2018, Mr. Schaap received analytical results from GEL Laboratories, LLC ("GEL Lab") for testing performed at Highland. The results indicated that Plaintiff had detections of PFAS at several dairy supply wells, milk tanks, and ground water wells.

43.     On October 15th, 2018, Dairy Direct notified Mr. Schaap that it would terminate the Milk Purchase Agreement executed with Highland Dairy as a result of the PFAS contamination at his dairy.

44.     As a result of the PFAS contamination in and around Highland, on November 5th, 2018, the New Mexico Department of Agriculture notified Highland that it has suspended Highland's Grade-A Permit for milk production.

45.     Highland typically sells approximately 15,000 gallons of Grade A Milk from the Highland Dairy each day.

46.     On November 7th, 2018, results were received from the Food and Drug Administration ("FDA") for water and milk samples collected at Highland showing levels of 1160 ppt & 1620 ppt PFOS respectively.

47.     On November 30th, 2018 the New Mexico Environment Department ("NMED") issued a Notice of Violation to the Air Force Civil Engineering Center regarding CAFB soil and groundwater contamination with per-and poly fluoroalkyls substances ("PFAS"). NMED

determined that CAFB is operating in violation of the New Mexico Water Quality Act ("WQA") and its correlated Ground and Surface Water Protection Regulations observed in section 20.6.2 of the New Mexico Administrative Code ("NMAC").

48. Defendants' AFFF products containing PFOA and PFOS, in unchanged form, were discharged into the environment through the foreseeable training, storage and use of the AFFF at CAFB.

49. Defendants' AFFF products containing PFAS contaminated the groundwater supply from which Plaintiff draws water for its domestic use, crops, livestock, dairy production and agricultural services.

50. As a direct and proximate result of Defendants' AFFF contaminating the groundwater, Plaintiff has incurred and will incur damages to the property and business.

## The Defendants

51. Defendant 3M Company (f/k/a Minnesota Mining and Manufacturing Company) ("3M") is a corporation organized and existing under the laws of the state of Delaware, having its principal place of business at 3M Center, St. Paul, Minnesota 55133.

52. Beginning before 1970 and until at least 2002, 3M manufactured, distributed, and sold AFFF containing PFOS.

53. 3M was the only company that manufactured or sold AFFF containing PFOS.

54. 3M manufactured and/or distributed and/or sold AFFF foam containing PFOS which was used at CAFB that foreseeably contaminated Plaintiff's property and business.

55. Defendant Tyco Fire Products LP ("Tyco") is a limited partnership formed in the State of Delaware with its principal place of business at 1400 Pennbrook Parkway, Landsdale, Pennsylvania 19446. Tyco is an indirect subsidiary ultimately wholly owned by Johnson

10

Controls International plc, an Irish public limited company listed on the New York Stock Exchange [NYSE: JCI].

56.     Tyco is the successor in interest of The Ansul Company ("Ansul"), having acquired Ansul in 1990. (Ansul and Tyco (as the successor in interest to Ansul), will hereinafter be collectively referred to as "Tyco/Ansul.").

57.     Beginning in or around 1975, Ansul manufactured and/or distributed and sold AFFF that contained fluorocarbon surfactants containing PFOA. After Tyco acquired Ansul in 1990, Tyco/Ansul continued to manufacture, distribute and sell AFFF that contained PFOA.

58.     Tyco/Ansul manufactured and/or distributed and/or sold AFFF foam containing PFOA which was used at CAFB that foreseeably contaminated Plaintiff's property and business.

59.     Defendant Chemguard is a Texas corporation with its principal place of business at One Stanton Street, Marinette, Wisconsin 54143.

60.     Beginning in or around 1994, Chemguard began manufacturing AFFF that contained PFOA.

61.     Chemguard manufactured and/or distributed and/or sold AFFF foam containing PFOA which was used at CAFB that foreseeably contaminated Plaintiff's property and business.

62.     Defendant Buckeye Fire Equipment Company ("Buckeye") is a foreign corporation organized and existing under the laws of the state of Ohio, with its principal place of business at 110 Kings Road, Kings Mountain, North Carolina 28086.

63.     Buckeye manufactured, distributed and/or sold AFFF containing PFOA which was used at CAFB that foreseeably contaminated Plaintiff's property and business.

11

64.     Defendant National Foam, Inc. (a/k/a Chubb National Foam) (collectively "National Foam") is a Delaware corporation, having a principal place of business at 144 Junny Road, Angier, North Carolina 27501.

65.     At all times relevant, National Foam designed, manufactured, and sold AFFF used in training operations and for emergency fire-fighting situations including at CAFB.

66.     DuPont Chemical Solutions Enterprise ("DuPont Chemical") is a Delaware Corporation, with a principal place of business located at 1007 Market Street Wilmington, Delaware 19898.

67.     DuPont Chemical was a member of the Telomer Research Program ("TRP"). As a member, it was required to provide a list and volume of products it was selling in the United States on a yearly basis.

68.     In a letter addressed to the Office of Pollution Prevention and Toxics (OPPT) Document Control Office, dated May 14, 2003 and signed by Stephen H. Korzeniowski, DuPont provided its Telomer-based sales products in the United States for the year 2002.

69.     The letter, which was redacted and sent to the EPA under its PFOA Stewardship Program, included Aqueous Fire Fighting Foam (AFFF) sales volume, on an active ingredient pound basis, as well as its Chemical Abstracts Service (CAS) number and chemical name, and is included in the PFOA Stewardship Program Docket.[1]

70.     Upon information and belief, at all times relevant, DuPont Chemical designed, manufactured, and sold AFFF and/or the PFOA in the AFFF that was used in training operations and for emergency fire-fighting situations including at the CAFB that contaminated Highland's wells.

---

[1] https://www.regulations.gov/docket?D=EPA-HQ-OPPT-2006-0621.

71.     Defendant, E.I. Du Pont de Nemours & Co. ("DuPont"), successor in interest to DuPont Chemical Solutions Enterprise, is a Delaware Corporation and does business throughout the United States, including conducting business in New Mexico. Its principal place of business is 974 Centre Road Wilmington, Delaware 19805.

72.     Defendant Chemours Company ("Chemours"), successor in interest to DuPont Chemical Solutions Enterprise, is a Delaware Corporation and conducts business throughout the United States, including conduction business in New Mexico. Its principal place of business is 1007 Market Street, Wilmington, Delaware, 19889.

73.     Defendant The Chemours Company FC. L.L.C. ("Chemours Company"), successor in interest to DuPont Chemical Enterprise, is a Delaware Corporation and conducts business throughout the United States, including conduction business in New Mexico. Its principal place of business is 100 Market Street Wilmington, Delaware, 19899.

74.     At all times relevant, Defendants DuPont Chemical, DuPont, Chemours and Chemours Company designed, manufactured, and sold AFFF and/or the PFAS ingredient in the AFFF, used in training operations and for emergency fire-fighting situations at CAFB that foreseeably contaminated Plaintiff's property and business.

## JURISDICTION AND VENUE

75.     This Court has jurisdiction pursuant to 28 U.S.C. § 1332 (a) because the parties are diverse and the amount in controversy exceeds $75,000.

76.     This Court has jurisdiction over Defendants because, based on information and belief, each is a corporation or other business that has sufficient minimum contacts in New Mexico or otherwise intentionally avails itself of the New Mexico market either through the distribution or sale of AFFF products and constituents in the State of New Mexico so as to render

13

the exercise of jurisdiction over it by this Court consistent with tradition notions of fair play and substantial justice.

77.     Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because the events, omissions and harms that are the basis of Plaintiff's claims occurred in substantial party in this District.

## GENERAL FACTUAL ALLEGATIONS

78.     PFAS materials are a class of non-naturally-occurring, man-made chemicals that were first developed in the late 1930s to 1940s and put into large-scale manufacture and use by the early 1950s.

79.     Defendants have each marketed, developed, distributed, sold, manufactured, released, trained users on, produced instructional materials for, and/or otherwise handled and/or used one or more PFAS materials, including in New Mexico and this District, in such a way as to cause the contamination of Plaintiff's groundwater with PFAS.

80.     Prior to commercial development and large-scale manufacture and use of PFAS materials, no such PFAS materials had been found, detected, or were present in human blood.

81.     By at least the end of the 1960s, animal toxicity testing performed by Defendants manufacturing and/or using PFAS materials indicated that exposure to such materials, including at least PFOA, resulted in various adverse health effects among multiple species of laboratory animals, including toxic effects to the liver, testes, adrenals, and other organs and bodily systems.

82.     By at least the end of the 1960s, additional research and testing performed by Defendants manufacturing and/or using PFAS materials indicated that such materials, including at least PFOA, because of their unique chemical structure, were resistant to environmental

14

degradation and would persist in the environment essentially unaltered if allowed to enter the environment.

83.    By at least the end of the 1970s, additional research and testing performed by Defendants manufacturing and/or using PFAS materials indicated that one or more such materials, including at least PFOA and PFOS, because of their unique chemical structure, would bind to proteins in the blood of animals and humans exposed to such materials where such materials would not only remain and persist over long periods of time but would accumulate and build up in the blood/body of the exposed individuals with each additional exposure, no matter how small.

84.    Defendants manufacturing and/or using PFAS materials released such PFAS materials into the environment during, as a result of, or in connection with their manufacturing and other commercial operations, including into the air, surface waters, ground water, soils, landfills, and/or through their involvement and/or participation in the creation of consumer or other commercial products and materials and related training and instructional materials and activities, including in New Mexico and this District, that Defendants knew, foresaw, and/or reasonably should have known and/or foreseen would expose Plaintiff to such PFAS.

85.    By at least the end of the 1970s, Defendants manufacturing and/or using PFAS materials, including at least DuPont and 3M, were aware that PFAS materials, including at least PFOA and PFOS, had been detected not only in the blood of workers at PFAS manufacturing facilities, but in the blood of the general population of the United States in people not known to be working at or living near PFAS manufacturing and/or use facilities, indicating to such Defendants that continued manufacture and use of such PFAS materials would inevitably result in continued and increased levels of PFAS getting into the environment and into human blood

15

across the United States, even in areas nowhere near or associated with specific PFAS manufacturing or use facilities.

86.     By at least the end of the 1980s, additional research and testing performed by Defendants manufacturing and/or using PFAS materials indicated that at least one such PFAS material, PFOA, had caused Leydig cell (testicular) tumors in a chronic cancer study in rats, resulting in at least one such Defendant, DuPont, classifying such PFAS material internally as a confirmed animal carcinogen and possible human carcinogen.

87.     It was understood by Defendants by at least the end of the 1980s that a chemical that caused cancer in animal studies must be presumed to present a cancer risk to humans, unless the precise mechanism of action by which the tumors were caused was known and it was known that such mechanism of action would not be operative and/or occur in humans.

88.     By at least the end of the 1980s, scientists had not determined the precise mechanism of action by which any PFAS material caused tumors and thus prevailing scientific principles of carcinogenesis classification mandated that Defendants presume any such PFAS material that caused tumors in animal studies could present a potential cancer risk to exposed humans.

89.     By at least the end of the 1980s, additional research and testing performed by Defendants manufacturing and/or using PFAS materials, including at least DuPont, indicated that elevated incidence of certain cancers and other adverse health effects, including elevated liver enzymes and birth defects, had been observed among workers exposed to such materials, including at least PFOA, but such data was not published, provided to governmental entities as required by law, or otherwise publicly disclosed at the time.

16

90.     By at least the end of the 1980s, Defendants, including at least 3M and DuPont, understood that, not only did these PFAS materials, including at least PFOA and PFOS, get into and persist and accumulate in human blood and in the human body, but that once in the human body and blood, particularly the longer-chain PFAS materials, such as PFOS and PFOA, had a long half-life, meaning that they would take a very long time (years) before even half of the material would start to be eliminated (assuming no further exposures), which allowed increasing levels of the chemicals to build up and accumulate in the blood and/or body of exposed individuals over time, particularly if any level of exposures continued.

91.     By at least the end of the 1990s, additional research and testing performed by Defendants manufacturing and/or using PFAS materials, including at least 3M and DuPont, indicated that at least one such PFAS material, PFOA, had caused a triad of tumors (Leydig cell (testicular), liver, and pancreatic) in a second chronic cancer study in rats.

92.     By at least the end of the 1990s, the precise mechanism(s) of action by which any PFAS material caused each of the tumors found in animal studies had still not been identified, mandating that Defendants continue to presume that any such PFAS material that caused such tumors in animal studies could present a potential cancer risk to exposed humans.

93.     By at least 2010, additional research and testing performed by Defendants manufacturing and/or using PFAS materials, including at least 3M and DuPont, revealed multiple potential adverse health impacts among workers exposed to such PFAS materials, including at least PFOA, such as increased cancer incidence, hormone changes, lipid changes, and thyroid and liver impacts, which such Defendants' own scientists, lawyers, and advisors recommended be studied further to assess the extent to which PFAS exposures were causing those effects.

17

94. When the United States Environmental Protection Agency ("USEPA") and other state and local public health agencies and officials first began learning of PFAS exposures in the United States and potential associated adverse health effects, Defendants repeatedly assured and represented to such entities and the public that such exposures presented no risk of harm and were of no legal, toxicological, or medical significance of any kind.

95. After USEPA and other entities began asking Defendants to stop manufacturing and/or using certain PFAS materials, Defendants began manufacturing and/or using and/or began making and/or using more of certain other and/or "new" PFAS materials, including PFAS materials with six or fewer carbons, such as GenX (collectively "Short-Chain PFAS").

96. Defendants manufacturing and/or using Short-Chain PFAS, including at least DuPont and 3M, are aware that one or more such Short-Chain PFAS materials also have been found in human blood.

97. By at least the mid-2010s, Defendants, including at least DuPont and Chemours, were aware that at least one Short-Chain PFAS had been found to cause the same triad of tumors (Leydig (testicular), liver, and pancreatic) in a chronic rat cancer study as had been found in a chronic rat cancer study with a non-Short-Chain PFAS.

98. As of today's date, the precise mechanism(s) of action by which any PFAS causes each of the tumors found in animal studies has(ve) not been identified, mandating that Defendants presume that any such PFAS material that caused such tumors in animal studies be presumed to present a potential cancer risk to exposed humans.

99. Research and testing performed by and/or on behalf of Defendants making and/or using Short-Chain PFAS indicates that such Short-Chain PFAS materials present the same,

18

similar, and/or additional risks to human health as had been found in research on other PFAS materials, including cancer risk.

100.   Nevertheless, Defendants repeatedly assured and represented to governmental entities and the public (and continue to do so) that the presence of PFAS materials, including these Short-Chain PFAS materials, in human blood at the levels found within the United States presents no risk of harm and is of no legal, toxicological, or medical significance of any kind.

101.   At all relevant times, Defendants, individually and/or collectively, have had the resources and ability but have intentionally, purposefully, recklessly, and/or negligently chosen not to fund or sponsor any study, investigation, testing, and/or other research of any kind of the nature Defendants claim is necessary to confirm and/or prove that the presence of any one and/or combination of PFAS in human blood causes any disease and/or adverse health impact of any kind in humans, presents any risk of harm to humans, and/or is of any legal, toxicological, or medical significance to humans, according to standards Defendants deem acceptable.

102.   Even after an independent science panel, known as the "C8 Science Panel," publicly announced in the 2010s that human exposure to 0.05 parts per billion or more of one PFAS, PFOA, in drinking water for one year or more had "probable links" with certain human diseases, including kidney cancer, testicular cancer, ulcerative colitis, thyroid disease, preeclampsia, and medically-diagnosed high cholesterol, Defendants repeatedly assured and represented to governmental entities, their customers, and the public (and continue to do so) that the presence of PFAS in human blood at the levels found within the United States presents no risk of harm and is of no legal, toxicological, or medical significance of any kind, and have represented to and assured such governmental entities, their customers, and the public (and continue to do so) that the work of the independent C8 Science Panel was inadequate to satisfy

the standards of Defendants to prove such adverse effects upon and/or any risk to humans with respect to PFAS in human blood.

103.   At all relevant times, Defendants shared and/or should have shared among themselves all relevant information relating to the presence, biopersistence, and bioaccumulation of PFAS in human blood and associated toxicological, epidemiological, and/or other adverse effects and/or risks.

104.   As of the present date, blood serum testing and analysis by Defendants, independent scientific researchers, and/or government entities has confirmed that PFAS materials are clinically demonstrably present in approximately 99% of the current population of the United States.

105.   There is no naturally-occurring "background," normal, and/or acceptable level or rate of any PFAS in human blood, as all PFAS detected and/or present in human blood is present and/or detectable in such blood as a direct and proximate result of the acts and/or omissions of Defendants.

106.   At all relevant times, Defendants, through their acts and/or omissions, controlled, minimized, trivialized, manipulated, and/or otherwise influenced the information that was published in peer-review journals, released by any governmental entity, and/or otherwise made available to the public relating to PFAS materials in human blood and any alleged adverse impacts and/or risks associated therewith, effectively preventing Plaintiff from discovering the existence and extent of any injuries/harm as alleged herein.

107.   At all relevant times, Defendants encouraged the continued and even further increased use and release into the environment of PFAS, including Clovis, Curry and New Mexico Districts, by their customers and others, including but not limited to through

20

manufacture, use, and release, of aqueous fire-fighting foams containing or made with PFAS and/or emergency responder protection gear or equipment coated with materials made with or containing PFAS, and tried to encourage and foster the increased and further use of PFAS, including in Clovis, Curry and New Mexico District, in connection with as many products/uses/and applications as possible, despite knowledge of the toxicity, persistence, and bioaccumulation concerns associated with such activities.

108.    Once governmental entities and regulators began learning of the potential toxicity, persistence, and bioaccumulation concerns associated with PFAS, Defendants cited to the pervasive use of such PFAS throughout numerous sectors of the American economy (which they had intentionally and purposefully encouraged and created) and the widespread presence of PFAS in blood of Americans (which they also had negligently, recklessly, and/or intentionally caused) as an excuse and/or reason not to restrict or regulate PFAS, essentially arguing that the issues associated with PFAS had become "too big to regulate".

109.    Defendants, to this day, affirmatively assert and represent to governmental entities, their customers, and the public that there is no evidence that any of the PFAS found in human blood across the United States causes any health impacts or is sufficient to generate an increased risk of future disease sufficient to warrant diagnostic medical testing, often referring to existing studies or data as including too few participants or too few cases or incidents of disease to draw any scientifically credible or statistically significant conclusions.

110.    Defendants, to this day, use and rely upon what they claim is this same "lack of definitive evidence of causation" as between any PFAS and any adverse human health effect to oppose and try to discourage regulatory and/or legislative efforts to limit, restrict, and/or address

21

PFAS impacts to the environment or human health, and to oppose, reject, and deny claims that PFAS has caused any injury or increased the risk of any adverse human health effects.

## **FACTUAL ALLEGATIONS AS TO ALL COUNTS**

### A.   **PFAS Soil and Groundwater Contamination at Cannon Air Force Base**

111.   On or about October 16, 2018 New Mexico Environment Department ("NMED"), New Mexico Department of Health ("NMDOH") and New Mexico Department of Agriculture ("NMDA") announced that the Air Force had informed them of wells contaminated with PFAS's, including but not limited to PFOA and PFOS, both on and off the base.

112.   The three state agencies said that until further testing confirms otherwise, all residents and businesses with private wells within a four-mile radius of the entire Cannon Air Force Base property should use bottled water.

113.   PFAS has been detected in on-base monitoring wells at concentrations exceeding 26,000 ppt.

114.   In a letter dated September 26, 2018, NMED required the Air Force to submit a comprehensive proposal to further delineate the groundwater plume, sample all water supply wells within a four-mile radius of the southeastern corner of the Air Force base, supply drinking water to affected well owners, and to resample the drinking water system on the Base.

115.   New Mexico Administrative Code, section 20.6.2.1201(A) requires a Notice of Intent to Discharge, relevant to this case stating the following:

> Any person intending to make a new water contaminant discharge or to alter the character or location of an existing water contaminant discharge, unless the discharge is being made or will be made into a community sewer system or subject to the Liquid Waste Disposal Regulations adopted by the New Mexico Environmental Improvement Board, shall file a notice with the Ground Water Quality Bureau of the department for discharges that may affect ground water, and/ or the Surface Water Quality

22

Bureau of the department for discharges that may affect surface water. [...]

116.     The United States Air Force (USAF) has advised that PFAS has been detected in a number of the 19 off-base wells tested thus far. Some of these wells supply drinking water to local dairies, including Highland. The Air Force has reported detections in off base wells with concentrations ranging from 25 to 1,600 ppt.

117.     NMDA requested the FDA to immediately determine if any impacts on health exist regarding the presence of PFAS in the food supply, including milk, and if so, that the FDA establish a regulatory threshold for PFAS in dairy products.

118.     As part of the Notice of Violation issued on November 30th, 2018 by NMED to the Air Force, State Officials determined that the WQA and the Ground and Surface Water Protection Regulations ("Regulations") provide explicit authority to NMED to prevent and abate water pollution. The WQA at NMSA 1978, §74-6-2(B) defines the term "water contaminant" as "any substance that could alter, if discharged or spilled, the physical, chemical, biological or radiological qualities of water." As such, all of the PFAS, and not solely PFOA and PFOS, compounds that the Air Force has discharged into groundwater are "water contaminants" under New Mexico law.

119.     Additionally, the WQA defines the term "water pollution" as introducing or permitting the introduction into water, either directly or indirectly, of one or more water contaminants in such quantity and of such duration as may with reasonable probability injure human health, animal or plant life or property, or to unreasonably interfere with the public welfare or the use of property." NMSA 1978, §74-6-2(C).

120.     The above statutory definition is not limited to human health, and explicitly includes animal and plant life and property.

23

121.   NMED concluded that to the extent that the PFAS water contaminants emanating from CAFB have injured or threaten to injure human health, animal or plant life, or property, or have unreasonably interfered with public welfare or the use of property such as water wells, farms and dairies, such injuries and interferences are clearly subject to the abatement requirements of the WQA and Regulations.

122.   Chemicals associated with Defendants' AFFF used at CAFB near Clovis have been detected in groundwater on and near the military installation, prompting requests by state officials for more tests and a study to determine the extent of the toxic plume.

123.   Plaintiff's dairy has lost about 15,000 gallons of milk daily since the U.S. Air Force announced water in the area being contaminated with PFAS and PFOS associated with past military firefighting activities at Cannon Air Force Base on October 16, 2018.

124.   As a result of the PFAS contamination at Highland, Plaintiff has lost several business current and future business opportunities due to the negative stigma now associated with dairy products produced in the area. For, example dairy plants do not want Plaintiff's milk and packing plants do not want Plaintiff's cows for beef. Moreover, the USDA has withdrawn Plaintiff's Grade-A milk permit.

125.   Plaintiff's crops used to feed their animals and land have also been contaminated with PFAS. Further, PFOA and PFOS has accumulated, making their way from water into crops, livestock and other products.

126.   The contamination has imperiled the future of Highland and its 40 employees.

127.   Water at Plaintiff's dairy and farm were found to be 200 times the EPA health advisory limit for PFOS, rendering it completely useless for human or animal consumption.

**B.     Background of PFOA and PFOS and The Known Risk to Groundwater**

128.    PFAS are chemical compounds containing fluorine and carbon atoms. These substances have been used for decades in the manufacture of, among other things, household and commercial products that resist heat, stains, oil, and water. These substances are not naturally occurring and must be manufactured.

129.    The two most widely studied types of these substances are PFOA and PFOS, which each contain eight carbon atoms.

130.    PFOA and PFOS have unique properties that cause them to be: (i) mobile and persistent, meaning that they readily spread into the environment where they break down very slowly; (ii) bioaccumulative and biomagnifying, meaning that they tend to accumulate in organisms and up the food chain; and (iii) toxic, meaning that they pose serious health risks to humans and animals. Because PFOA and PFOS have these properties, they pose significant threats to public health and the environment.

131.    PFOA and PFOS easily dissolve in water, and thus they are mobile and readily spread in the environment. PFOA and PFOS also readily contaminate soils and leach from the soil into groundwater, where they can travel significant distances.

132.    PFOA and PFOS are characterized by the presence of multiple carbon-fluorine bonds, which are exceptionally strong and stable. As a result, PFOA and PFOS are thermally, chemically, and biologically stable and they resist degradation due to light, water, and biological processes.

133.    Bioaccumulation occurs when an organism absorbs a substance at a rate faster than the rate at which the substance is lost by metabolism and excretion. Biomagnification occurs when the concentration of a substance in the tissues of organisms increases as the substance travels up the food chain.

134.    PFOA and PFOS bioaccumulate/biomagnify in numerous ways. First, they are relatively stable once ingested, so that they bioaccumulate in individual organisms for significant periods of time. Because of this stability, any newly ingested PFOA and PFOS will be added to any PFOA and PFOS already present. In humans, PFOA and PFOS remain in the body for years.

135.    Third, they biomagnify up the food chain, such as when humans eat fish that have ingested PFOA or PFOS.

136.    Exposure to PFOA and PFOS can be toxic and may pose serious health risks to humans and to animals. Human health effects associated with PFOA exposure include kidney and testicular cancer, thyroid disease, high cholesterol, ulcerative colitis, liver damage, and pregnancy-induced hypertension (also known as preeclampsia). Human health effects associated with PFOS exposure include immune system effects, changes in liver enzymes and thyroid hormones, low birthweight, high uric acid, and high cholesterol. In laboratory testing on animals, PFOA and PFOS have caused the growth of tumors, changed hormone levels, and affected the function of the liver, thyroid, pancreas, and immune system.

### C.    Defendants' Development of AFFF Products Containing PFOA and/or PFOS

137.    In the 1940s, 3M began using a process called electrochemical fluorination to create carbon-fluorine bonds, which are key components of PFOA and PFOS. 3M soon discovered that these types of substances have strong surfactant properties, meaning that they reduce the surface tension between a liquid and another liquid or solid. This reduced surface tension enabled 3M to develop a myriad of products that resist heat, stains, oil, and water. These products included older forms of Scotch Gard, which contained PFOS and when applied to fabric, furniture, and carpets protected against liquids and stains.

26

138.    Building on these earlier experiments, in the early 1960s 3M began developing firefighting foams containing PFOS to suppress flammable liquid fires, which cannot be effectively extinguished with water alone.

139.    AFFF does not have the same problems that water alone does in extinguishing flammable liquid fires. AFFF concentrate containing PFOA or PFOS forms foam when it is mixed with water and ejected from a nozzle. That foam is then sprayed so that it coats the fire, blocking the supply of oxygen feeding the fire and creating a cooling effect and evaporation barrier to extinguish the vapors on fire. A film also forms to smother the fire after the foam has dissipated.

## D.    Defendants' Knowledge of the Threats to Public Health and the Environment Posed by PFOA and PFOS

140.    On information and belief, by at least the 1970s 3M knew or should have known that PFOA and PFOS are mobile and persistent, bioaccumulative and biomagnifying, and toxic.

141.    Upon information and belief, 3M concealed from the public and government agencies its knowledge of the risk of harm posed by PFOA and PFOS.

142.    In 1975, 3M concluded that PFOS was present in the blood of the general population. Since PFOA and PFOS are not naturally occurring, this finding should have alerted 3M to the possibility that their products were a source of this PFOS. The finding also should have alerted 3M to the possibility that PFOS might be mobile, persistent, bioaccumulative, and biomagnifying, as those characteristics could explain the absorption of PFOS in blood from 3M's products.

143.    In 1976, 3M found PFOA in the blood of its workers. This finding should have alerted 3M to the same issues raised by the findings regarding PFOS in the prior year.

27

144.    A 1978 study by 3M showed that PFOA reduced the survival rate of fathead minnow fish eggs. Other studies by 3M in 1978 showed that PFOS and PFOA are toxic to rats, and that PFOS is toxic to monkeys. In one study in 1978, all monkeys died within the first few days of being given food contaminated with PFOS.

145.    Studies by 3M after the 1970s also showed adverse effects from exposure to PFOA and PFOS. In a 1983 study, for example, 3M found that PFOS caused the growth of cancerous tumors in rats.

146.    A study proposal by 3M in 1983 stated that the resistance to degradation of PFOA and PFOS made them "potential candidates for environmental regulations, including further testing requirements under laws such as the Toxic Substances Control Act." 3M Environmental Laboratory (EE & PC), Fate of Fluorochemicals - Phase II, at p.6 (E. A. Reiner, ed. May 20, 1983).

147.    A 1997 material safety data sheet ("MSDS") for a non-AFFF product made by 3M listed its only ingredients as water, PFOA, and other per-fluoroalkyl substances and warned that the product includes "a chemical which can cause cancer." The MSDS cited "1983 and 1993 studies conducted jointly by 3M and DuPont" as support for this statement. On information and belief, 3M's MSDSs for AFFF did not provide similar warnings.

148.    Federal law requires chemical manufacturers and distributors to immediately notify the United States Environmental Protection Agency ("EPA") if they have information that "reasonably supports the conclusion that such substance or mixture presents a substantial risk of injury to health or the environment." Toxic Substances Control Act ("TSCA") § 8(e), 15 U.S.C. § 2607(e).

28

149.    3M did not comply with its duty under TSCA, and in April 2006 it agreed to pay EPA a penalty of more than $1.5 million for its failure to disclose studies regarding PFOA or PFOS and other per-fluoroalkyl substances dating back decades, among other things.

150.    On information and belief, all defendants knew or should have known that in its intended and/or common use, AFFF containing PFOA or PFOS would very likely injure and/or threaten public health and the environment. On information and belief, this knowledge was accessible to all defendants. For example, in 1970 a well-established firefighting trade association was alerted to the toxic effects on fish of a chemical compound related to PFOS. On information and belief, at least the following defendants are and/or were members of this trade association: 3M, Tyco/Ansul, Chemguard, and National Foam/Angus.

151.    Additionally, on information and belief, all defendants knew or should have known that their AFFF products and the PFOA and PFOS the products contained, easily dissolve in water, because the products were designed to be mixed with water; are mobile, because the products were designed to quickly form a thin film; resist degradation, because that is the nature of the products' chemical composition, and on information and belief the products had long shelf-lives; and tend to bioaccumulate, because studies regarding the presence of substances with carbon-fluorine bonds in the blood of the general population were publicly available beginning in at least 1976.

### E.    Evolving Understanding of the Levels of Acceptably Safe Exposure to PFOA/S

152.    As discussed above, neither 3M nor, on information and belief, the other defendants, complied with their obligations to notify EPA about the "substantial risk of injury to health or the environment" posed by their AFFF products containing PFOA/S. See TSCA § 8(e)

153.   In or around 1998, EPA began investigating the safety of PFOA and PFOS after some limited disclosures by 3M and others.

154.   Beginning in 2009, EPA issued health advisories about the levels of exposure to PFOA and PFOS in drinking water that it believed were protective of public health. As described on EPA's website, "health advisories are non-enforceable and non-regulatory and provide technical information to states [,] agencies and other health officials on health effects, analytical methodologies, and treatment technologies associated with drinking water contamination." *Drinking Water Health Advisories for PFOA and PFOS, What's A Health Advisory*, available at https://www.epa.gov/ground-water-and-drinking-water/drinking-waterhealth-   advisories-pfoa-and-pfos (last visited June 5, 2018).

155.   The recommendations in EPA's health advisories evolved as EPA learned more about PFOA and PFOS.

156.   On January 8, 2009 EPA issued Provisional Health Advisories for PFOA and PFOS, advising that "action should be taken to reduce exposure" to drinking water containing levels of PFOA and PFOS exceeding 400 parts per trillion ("ppt") and 200 ppt, respectively. Provisional Health Advisories for Perfluorooctanoic Acid (PFOA) and Perfluorooctane Sulfonate (PFOS), *available at https://www. cpa.gov/sites/productionlfiles/2015 0-9/documents/pfoa- pfos-provisional.pdf*, at p. 1, n. 1 (last visited June 5, 2018).

157.   On or around May 19, 2016, the EPA issued updated Drinking Water Health Advisories for PFOA and PFOS, recommending that drinking water concentrations for PFOA and PFOS, either singly or combined, should not exceed 70 ppt. See Lifetime Health Advisories and Health Effects Support Documents for PFOA and PFOS, 81 Fed. Reg. 33, 250-51 (May 25, 2016).

158.    In June, 2018, the Agency for Toxic Substances and Disease Registry ("ATSDR") and EPA released a draft toxicological profile for PFOS and PFOA and recommended the drinking water advisory levels be lowered to 11 ppt for PFOA and 7 ppt for PFOS.

### F.    The Use of Defendants' AFFF Products Containing PFOA/PFOS in New Mexico

159.    Defendants' AFFF products containing PFOA/S have been used for decades throughout New Mexico at civilian airports and other facilities, including the CAFB.

160.    Upon information and belief, defendants manufactured and sold AFFF products containing PFOA and PFOS that were used and discharged at CAFB for training purposes at several locations at the base.

161.    Due to the Defendants' failure to warn and advise the user that the AFFF should not be permitted to enter the soil, water, or groundwater, the AFFF was left to enter into the soil or simply washed off the tarmac and foreseeably into the groundwater.

162.    Defendants failed to warn the end user and sensitive receptors, such as Plaintiff, that AFFF permeates through the ground to the groundwater.

163.    Defendants further failed to warn the end user that the AFFF soaks into the concrete or asphalt tarmac to slowly release PFOA and PFOS into the subsurface and groundwater over decades.

164.    Sampling results of surface water, groundwater, and soil, at or near CAFB demonstrate the presence of elevated concentrations of PFOA and PFOS, which were components in Defendants' AFFF products.

165.    Upon information and belief, Defendants did not provide adequate warnings regarding the public health and environmental hazards associated with their AFFF products

31

containing PFOA and PFOS. Nor did Defendants provide adequate instructions about how to avoid or mitigate such hazards.

166. Defendants' AFFF products were used in the normal, intended, and foreseeable manner that resulted in the discharge of PFOA and PFOS into the environment and potable water supplies of Highland.

### G. AFFF Containing PFOA and PFOS is Fungible and Commingled in the Groundwater

167. AFFF containing PFOA and/or PFOS, once it has been released to the environment and groundwater, lacks characteristics that would enable identification of the company that manufactured that particular AFFF.

168. The process of manufacture and distribution of AFFF, including that which contains PFOA and/or PFOS, sometimes includes complex arrangements whereby Defendants sell product for delivery through specific military bases and/or third-party logistic intermediaries throughout the country.

169. A subsurface plume, even if it comes from a single location, such as a retention fire training area, most likely originates from mixed batches of AFFF coming from different manufacturers.

170. There were several areas located around CAFB where firefighting exercises were historically conducted, where AFFF was used and entered the groundwater and it is not possible to determine the identity of the manufacturer whose AFFF containing PFOA and PFOS contributed to the groundwater contamination plume impacting Plaintiff Highland Dairy.

171. Because precise identification of the specific manufacture of any given AFFF that was the source of PFOA and PFOS found in and around Plaintiff's property is impossible,

32

Plaintiff must pursue all Defendants, jointly and severally, for those indivisible injuries which Defendants have collectively visited upon Plaintiff.

172.    Defendants are also jointly and severally liable because they conspired to conceal the true toxic nature of PFOS and PFOA, to profit from the use of AFFF containing PFOA and PFOS, at Plaintiff's expense, to contaminate Plaintiff's water supply, and to attempt to avoid liability for such contamination of the groundwater.

### H.    Alternative Liability, Concert of Action, Enterprise Liability

173.    Defendants in this action are manufacturers that control a substantial share of the market for AFFF-containing PFOA and/or PFOS in the United States and are jointly responsible for the contamination of Plaintiff's groundwater supply and for causing the damages and injuries complained of in this Complaint.

174.    Enterprise liability attaches to all Defendants and the liability of each should be assigned according to its percentage of liability for AFFF-containing PFOA and/or PFOS at issue in this Complaint. PFOA and PFOS is fungible; it is impossible to identify the exact Defendant who manufactured any given batch of AFFF containing PFOA and/or PFOS found free in the groundwater, and, each of these Defendants participated in a state-wide and national market for AFFF containing PFOA and/or PFOS during the relevant time.

175.    Concert of action liability attaches to all Defendants, each of which participated in a common plan to commit the torts alleged herein and each of which acted tortuously in pursuance of the common plan to knowingly manufacture and sell inherently dangerous AFFF-containing PFOA and/or PFOS.

176.    Enterprise liability attaches to all of the named Defendants for casting defective products into the stream of commerce.

33

## I. Products Strict Liability and Negligence Claims in New Mexico

177. New Mexico recognizes products liability claims sounding in common law negligence and in strict liability. *Parker v. St. Vincent Hospital*, 122 N.M. 39, 919 P.2d 1104 (Ct.App.1996).

178. To prevail in a negligence claim related to a defective product, Plaintiff must "establish (1) the existence of a duty owed to Plaintiff[], (2) a breach of such duty, (3) a causal connection between [Defendants'] conduct and the injury to Plaintiff[], and (4) damages resulting from such conduct." *Parker v. EI Du Pont De Nemours & Co.*, 909 P.2d 1 (N.M. Ct. App. 1995).

179. Under New Mexico negligence law, "manufacturers and distributors of products have a duty to use ordinary care in producing products so as to avoid a foreseeable risk of injury caused by a condition of the product or the manner in which it is used." *Smith ex rel. Smith v. Bryco Arms*, 131 N.M. 87, 33 P.3d 638 (Ct. App. 2001). This duty exists as a matter of law. *Id.*

180. A manufacturer must use ordinary care—that which a reasonably prudent supplier would use in the course of his business—in formulating, designing, making, inspecting, testing, and packaging the product. NMRA UJI 13-1407; NMRA UJI 13-1410.

181. "Under the strict products liability theory, a supplier of products is liable for harm proximately caused by an unreasonable risk of injury resulting from a condition of the product or from the manner of its use." *Bryco Arms*, 131 N.M. at 90.

182. To prevail under a strict liability theory, Plaintiff must establish that: (1) the product was defective, (2) the product was defective when it left Defendants' hands, and it was substantially unchanged when it reached the consumer; (3) that because of the defect the product was unreasonably dangerous to the consumer; (4) that the consumer was injured or damaged; and

34

(5) the defective product was the proximate cause of the injury or damage. *Garner v. Raven Indus., Inc.*, 732 F.2d 112, 114 (10th Cir. 1984).

183. "An unreasonable risk of injury is a risk [that] a reasonably prudent person having full knowledge of the risk would find unacceptable." *Bryco Arms*, 131 N.M. at 90. The "unreasonable risk of injury test allows for proof and argument under any rational theory of defect." *Id.*

184. Three categories of "defect" are recognized in New Mexico: manufacture, design, and defects in the marketing related to a failure to warn. *Fernandez v. Ford Motor Co.*, 118 N.M. 100 879, P.2d 101 (1994).

## COUNT I
## STRICT LIABILITY – DESIGN DEFECT AND/OR DEFECTIVE PRODUCT PURSUANT TO NEW MEXICO RULES ANNOTATED (NMRA) UNIFORM JURY INSTRUCTIONS (UJI) 13-1424

185. Plaintiff realleges each of the preceding paragraphs and incorporates each such paragraphs as if fully stated herein.

186. In New Mexico, a defective product is a cause of injury if "it contributes to bringing about" the injury and if the injury would not have occurred without it. NMRA UJI 13-1424. "It need not be the only explanation for the" injury, "nor the reason that is nearest in time or place; [i]t is sufficient if occurs in combination with some other cause to produce the result." *Id.* "To be a 'cause,' the defective product must be reasonably connected as a significant link to the injury. " *Id.*

187. NMRA UJIs 13-1406 and 13-1407 establishes the definition of "defective product."

188. Defendants' AFFF was defective in design or formulation pursuant to NMRA UJI 13-1424 and it is reasonably connected as a significant link to the damages suffered by Plaintiff.

189.    As commercial designers, manufacturers, distributors, suppliers, sellers, and/or marketers of AFFF containing PFAS, Defendants had a strict duty not to place into the stream of commerce a product that is unreasonably dangerous.

190.    Defendants knew that third parties would purchase AFFF containing PFAS and use it without inspection for defects.

191.    At the time of manufacture, Defendants knew that the chosen formulation of AFFF, which included PFAS, was not biodegradable and bioaccumulated in fish, wildlife, livestock, and humans.

192.    AFFF containing PFAS purchased or otherwise acquired (directly or indirectly) from Defendants by third parties were applied, discharged, disposed of, or otherwise released onto lands and/or water in the vicinity of Plaintiff's water production wells, including but not limited to CAFB. Such discharges occurred at various locations, at various times, and in various amounts.

193.    The AFFF containing PFAS purchased by third parties was used in a reasonably foreseeable manner and without substantial change in the condition of such products.

194.    The defects existed at the time the products left Defendants' possession.

195.    Defendants were also aware, and/or in the possession of, an available safer design that was functional and reasonably priced.

196.    Defendants knew or reasonably should have known that the use of AFFF containing PFAS in its intended manner would foreseeably result in the spillage, discharge, disposal, or release of AFFF onto land or into groundwater supplies.

197.    The AFFF containing PFAS used in the vicinity of Plaintiff's water production wells was defective in design and unreasonably dangerous because, among other things:

36

    a.      PFAS causes extensive and persistent groundwater contamination when it, or products containing it, are used in their foreseeable and intended manner.

    b.      PFAS contamination in drinking water poses significant threats to public health and welfare.

    c.      Defendants failed to conduct and/or failed to disclose reasonable, appropriate, or adequate scientific studies to evaluate the environmental fate and transport and potential human health effects of PFAS.

198.   At all times relevant to this action, AFFF containing PFAS was dangerous to an extent beyond that which would be contemplated by the ordinary consumer, and/or the foreseeable risk of harm to public health and welfare posed by PFAS outweighed the cost to Defendants of reducing or eliminating such risk.

199.   Defendants knew or should have known about feasible alternatives to producing AFFF without the use of PFAS, and the omission of such alternative designs rendered AFFF not reasonably safe.

200.   As a direct and proximate result of the defects previously described, Plaintiff's water wells have been, and continue to be, contaminated with PFAS in varying amounts over time, causing Plaintiff significant injury and damage.

201.   As a direct and proximate result of Defendants' acts and omissions as alleged herein, Plaintiff has incurred, is incurring, and will continue to incur damages related to PFAS contamination of its wells in an amount to be proved at trial.

202.   Defendants knew it was substantially certain that their acts and omissions described above would cause injury and damage, including PFAS contamination of groundwater. Defendants committed each of the above-described acts and omission knowingly, willfully, and with oppression, fraud, and/or malice. Such conduct was performed to promote sales of AFFF, in conscious disregard of the probable dangerous consequences of that conduct and its reasonably foreseeable impacts on public health and welfare. Therefore, Plaintiff requests an award of

punitive damages in an amount sufficient to punish these Defendants and that fairly reflects the aggravating circumstances alleged herein.

203.     Defendants are strictly, jointly and severally liable for all such damages, and Plaintiff is entitled to recover all such damages and other relief as set forth below.

## COUNT II
## STRICT LIABILITY- FAILURE TO WARN
## PURSUANT TO NEW MEXICO RULES ANNOTATED (NMRA) UNIFORM JURY INSTRUCTIONS (UJI) 13-1418 & 13-1425

204.     Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated herein.

205.     According to NMRA UJI 13-1418 in order for Plaintiff [t]o satisfy the duty [to warn] [to give directions for use], [a warning] [directions for use] must be adequate. To be adequate, [a warning] [directions for use] must have certain characteristics:

a.     It must be in a form that can reasonably be expected to catch the attention of the reasonably foreseeable user of the product;

b.     It must be understandable to the reasonably foreseeable user of the product; and

c.     It must disclose the nature and extent of the danger. In this regard, there must be specified any harmful consequence which a reasonably foreseeable user would not understand from a general warning of the product's danger [or] [from a simple directive to use or not to use the product for a certain purpose or in a certain way].

206.     Additionally, as established by NMRA 13-1425, Plaintiff has a cause of action for failure to warn "[i]f, in light of all the circumstances of this case, [an adequate warning] [adequate directions for use] would have been noticed and acted upon to guard against the danger, a failure to give [an adequate warning] [adequate directions for use] is a cause of injury."

207.     As commercial distributors, sellers, manufacturers, suppliers, marketers, and/or designers of AFFF, Defendants had a strict duty to warn against latent dangers resulting from foreseeable uses of the product that Defendants knew or should have known about.

38

208.    At the time of marketing, when the AFFF left control of the Defendants, Defendants knew, or in the exercise of reasonable care, should have known that the AFFF was not biodegradable, and that it bioaccumulated in fish, wildlife and humans, and knew they were providing an inadequate warning or instruction about the inherent danger of allowing the AFFF to be dumped on the ground where by runoff or permeation through the ground it would infiltrate groundwater.

209.    Defendants knew that third parties would purchase AFFF containing PFAS and expect that it was biodegradable and use it at CAFB, where runoff would permeate into Plaintiff's crops, groundwater and production wells severely affecting their livestock, drinking water and milk production.

210.    AFFF containing PFAS purchased or otherwise acquired (directly or indirectly) from Defendants by third parties was applied, discharged, disposed of, or otherwise released at various locations, at various times, and in various amounts onto the lands and/or water in the vicinity of Plaintiff's drinking water production wells.

211.    The AFFF containing PFAS purchased by third parties was used in a reasonably foreseeable manner and without substantial change in the condition of such products.

212.    Defendants knew or should have known that the use of AFFF containing PFAS in its intended manner would result in the discharge, disposal, or release of PFAS onto land and into groundwater.

213.    The AFFF containing PFAS used in the vicinity of Plaintiff's land and water production wells was defective in design and unreasonably dangerous for the reasons set forth above.

39

214.    Despite the known and/or reasonably foreseeable hazards to human health and welfare associated with the use of AFFF containing PFAS in the vicinity of Plaintiff's water production wells, including contamination of public drinking water wells with PFAS, Defendants failed to provide adequate warnings of, or take any other precautionary measures to mitigate, those hazards.

215.    In particular, Defendants failed to describe such hazards or provide any precautionary statements regarding such hazards in the labeling of their AFFF products containing PFAS or otherwise.

216.    In Defendants' marketing, distribution and selling of AFFF containing PFOA and PFOS, Defendants' provided no warnings or inadequate warnings to consumers, end users, and sensitive receptors like Plaintiff, about the dangerous propensities of the PFAS's in the AFFF.

217.    As a direct and proximate result of Defendants' failure to warn of the hazards posed by disposal or release of AFFF containing PFAS in the vicinity of subterranean public drinking water wells that were, or reasonably should have been, known to them, PFAS contaminated Plaintiff's supply wells.

218.    As a direct and proximate result of Defendants' acts and omissions as alleged herein, Plaintiff has incurred, is incurring, and will continue to incur damages related to PFAS contamination of its wells in an amount to be proved at trial.

219.    Defendants knew it was substantially certain that their acts and omissions described above would cause injury and damage, including PFAS contamination of water supply wells.

220.    Defendants committed each of the above-described acts and omission knowingly, willfully, and with oppression, fraud, and/or malice. Such conduct was performed to promote

sales of AFFF, in conscious disregard to the probable dangerous consequences of that conduct and its reasonably foreseeable impacts on public health and welfare. Therefore, Plaintiff requests an award of punitive damages in an amount sufficient to punish these Defendants and that fairly reflects the aggravating circumstances alleged herein.

221. Defendants are strictly, jointly and severally liable for all such damages, and Plaintiff is entitled to recover all such damages and other relief as set forth below.

## COUNT III
## NEGLIGENCE

222. Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated herein.

223. As commercial distributers, sellers, manufacturers, suppliers, marketers, and/or designers, Defendants owed a duty of care to Plaintiff not to place into the stream of commerce a product, AFFF, that was in a defective condition and unreasonably dangerous to groundwater.

224. Defendants breached this duty by negligently designing, formulating, manufacturing, distributing, selling, supplying, and/or marketing such unreasonably dangerous products into the stream of commerce, including for use at CAFB, even when they knew or should have known of the dangers PFAS posed to groundwater and potable water supplies.

225. Among other things, Defendants breached this duty when they manufactured, marketed, distributed, supplied, and sold AFFF even though they knew or should have known of the dangers that PFAS posed to groundwater. Defendants should have known that the manner in which they were manufacturing, marketing, and selling AFFF containing PFAS compounds, like PFOS and PFOA, would result in the contamination of the water supply wells, including Plaintiff's groundwater, production wells, crops, livestock, drinking water as well as milk and dairy production.

41

226.    Defendants knew or should have known that exposure to PFAS was hazardous to the environment and to human health.

227.    As a direct and proximate result of Defendants' acts and omissions as alleged herein, Plaintiff has incurred, is incurring, and will continue to incur damages related to PFAS contamination of its supply wells in an amount to be proved at trial.

228.    Defendants knew it was substantially certain that their acts and omissions described above would cause injury and damage, including PFAS contamination of groundwater supply wells. Defendants committed each of the above-described acts and omission knowingly, willfully, and with oppression, fraud, and/or malice. Such conduct was performed to promote sales of AFFF, in conscious disregard to the probable dangerous consequences of that conduct and its reasonably foreseeable impacts on Plaintiff's health and welfare. Therefore, Plaintiff requests an award of punitive damages in an amount sufficient to punish these Defendants and that fairly reflects the aggravating circumstances alleged herein.

229.    Defendants are jointly and severally liable for all such damages, and Plaintiff is entitled to recover all such damages and other relief as set forth below.

## COUNT IV
## PRIVATE NUISANCE

230.    Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated herein.

231.    Plaintiff is the owner of land, crops and livestock that relies on groundwater for use in its dairy production and quality assurance for its clients.

232.    Plaintiff utilizes drinking water for its family members from its groundwater supply wells that is used for drinking, bathing, cleaning, washing, cooking, watering vegetables, and other uses.

42

233.    Plaintiff also utilizes drinking water to feed cattle and irrigate their crops from its groundwater supply wells that is used for the milk and dairy production as well as for other livestock and agricultural uses.

234.    Defendants' acts and omissions, including their manufacture, distribution, sale, supply, marketing, and defective design of, and/or failure to warn regarding PFAS in AFFF contaminated Plaintiff's wells, rendering water served from them unfit for human, animal or agricultural consumption.

235.    Defendants had knowledge of PFAS' unique and dangerous chemical properties and knew that contamination of public groundwater supply wells was substantially certain to occur, but failed to provide adequate warnings of, or take any other precautionary measures to mitigate, those hazards.

236.    The contamination caused, contributed to, and/or maintained by Defendants substantially and unreasonably interferes with Plaintiff's property rights to appropriate, use, and enjoy water from its wells.

237.    Defendants' intentional, negligent, and/or reckless conduct, as alleged herein, has resulted in substantial contamination of Plaintiff's supply wells by PFAS, human carcinogens that cause adverse human, animal and agricultural health effects and render water undrinkable.

238.    Consequently, Defendants substantially interfered with and caused damage to a public or common resource that endangered private property, as well as the health, safety, and comfort of a considerable number of persons, animals and the agricultural and livestock business. Such action creates, contributes to, or maintains a private nuisance.

43

239.   As an owner of livestock, crops and agricultural endeavors, Plaintiff suffered injuries different in kind from the community at large because it relies entirely upon its water production wells for its private business functions, the dairy.

240.   Defendants knew it was substantially certain that their acts and omissions described above would cause injury and damage, including PFAS contamination of the groundwater supply. Defendants committed each of the above-described acts and omission knowingly, willfully, and with oppression, fraud, and/or malice. Such conduct was performed to promote sales of AFFF, in conscious disregard to the probable dangerous consequences of that conduct and its reasonably foreseeable impacts on Plaintiff's health and welfare. Therefore, Plaintiff requests an award of punitive damages in an amount sufficient to punish these Defendants and that fairly reflects the aggravating circumstances alleged herein.

241.   Defendants are jointly and severally liable for all such damages, and Plaintiff is entitled to recover all such damages and other relief as set forth below.

## COUNT V
## TRESPASS

242.   Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated herein.

243.   Plaintiff actually and actively exercises its rights to appropriate and use groundwater drawn from its wells for the dairy production.

244.   Plaintiff did not give any Defendant permission to cause PFAS to enter its groundwater wells.

245.   Defendants knew or reasonably should have known that:

a.   PFAS have a propensity to infiltrate groundwater aquifers when released to the environment;

b.   PFAS are mobile and persistent groundwater contaminants capable of moving substantial distances within aquifers;

c.   They are toxic to human health; and

d.   They are therefore hazardous to public water systems and human health and welfare.

246.   Defendants manufactured, promoted, marketed, distributed, and/or sold AFFF containing PFAS, which Defendants knew or reasonably should have known would inevitably be discharged and release toxic PFAS into the ground and intrude upon, contaminate, and damage Plaintiff's possessory interest.

247.   Defendants' willful conduct directly resulted in the placement of its product, AFFF, on and in property owned by Plaintiff without permission or right of entry.

248.   Each Defendant is a substantial factor in bringing about the contamination of Plaintiff's wells, and each Defendant aided and abetted the trespasses and is jointly responsible for the injuries and damage caused to Plaintiff.

249.   As a direct and proximate result of Defendants' acts and omissions resulting in PFAS entering Plaintiff's Water wells at Highland Dairy, Plaintiff sustained actual injuries and damages related to the PFAS contamination of its wells in an amount to be proved at trial.

250.   Defendants knew it was substantially certain that their acts and omissions described above would cause injury and damage, including PFAS contamination of the public groundwater supply. Defendants committed each of the above-described acts and omission knowingly, willfully, and with oppression, fraud, and/or malice. Such conduct was performed to promote sales of AFFF, in conscious disregard to the probable dangerous consequences of that conduct and its reasonably foreseeable impacts on Plaintiff's health and welfare. Therefore, Plaintiff requests an award of punitive damages in an amount sufficient to punish these Defendants and that fairly reflects the aggravating circumstances alleged herein.

251.   Defendants are jointly and severally liable for all such damages, and Plaintiff is entitled to recover all such damages and other relief as set forth below.

## COUNT VI
## ALTERNATIVE LIABILITY, CONCERT OF ACTION, ENTERPRISE LIABLITY

252.   Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated herein.

253.   Defendants in this action are manufactures, distributors, sellers, suppliers and marketers of AFFF containing PFAS that control a substantial share of the market for AFFF in New Mexico and are jointly responsible for the increased threat to groundwater in New Mexico and for causing the injuries complained of in this Complaint.

254.   Advances in science and technology have allowed Defendants to create a fungible good that has been shown to harm Plaintiff and its customers and which cannot be traced to any specific producer.

255.   AFFF containing PFAS is fungible once it is in the groundwater. It is impossible to identify the exact commercial entity that manufactured any given batch of PFAS found free in the environment; and, each of these Defendants participated in a state-wide and national market for AFFF containing PFAS during the relevant time in Curry County, New Mexico.

256.   Concert of action liability attaches to Defendants each of which participated in a common plan to commit the intentional torts alleged herein and each of which acted tortiously in pursuance of the common plan.

257.   Defendants in this action acted in concert to transport, distribute, supply, sell and/or market AFFF containing PFAS as a safe and effective product for use by the public.

258.   Enterprise liability attaches to the named Defendants.

46

259.    Because Defendants acted with malice in their conscious, willful, and wanton disregard of the probable dangerous consequences of their conduct and its foreseeable impact upon the Plaintiff, Plaintiff is entitled to punitive damages.

**COUNT VII**
**CONSPIRACY BETWEEN DEFENDANTS**

260.    Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if restated in full herein.

261.    Defendants maliciously conspired among each other and with consulting firms, agents, representatives, and others and/or through forming joint task forces, committees, coalitions, trade groups, and/or councils and/or otherwise colluding through unlawful, affirmative misrepresentations and/or unlawful concealment of material facts regarding PFAS, including but not limited to each such act and/or omission described in this Complaint, to illegally and/or wrongfully create and perpetuate a market for PFAS, increase exposures to PFAS, produce profits for PFAS, conceal, misrepresent, and/or mislead as to the dangers and toxicity associated with PFAS and/or conduct other operations and activities in a manner as to illegally and/or wrongfully cause, permit, and/or allow PFAS to contaminate Plaintiff's groundwater with PFAS, by illegally and/or wrongfully using, creating, and/or collecting data related to PFAS exposure among Plaintiff in experiments, studies, research, and/or other scientific inquires without the consent, knowledge, permission, and/or awareness, of Plaintiff, and also by illegally and/or wrongfully avoiding properly notifying the public or government officials of the ongoing release and continuing exposure of PFAS into the environment, and illegally and/or wrongfully avoiding correcting, clarifying, rescinding, and/or qualifying their misrepresentations to Plaintiff regarding PFAS and that Defendants acts and/or omissions were not causing any physical harm, injury of any kind, and/or damage to them.

262.    The purpose and result of Defendants' and their co-conspirators' conspiracy was to wrongfully and/or unlawfully hide Defendants' illegal and unlawful acts and/or omissions that resulted in the contamination of Plaintiff's groundwater, to improperly minimize, trivialize, and/or misrepresent the actual harm and/or risks of PFAS exposures, to wrongfully and/or unlawfully deceive Plaintiff, into believing that PFAS was safe and/or to avoid lost profits and other economic harm to Defendants.

263.    Defendants' and their co-conspirators' conspiracy and the wrongful and/or unlawful acts in furtherance of their conspiracy directly and proximately induced justified reliance by Plaintiff, which directly and proximately caused the contamination of Plaintiff's groundwater with PFAS.

264.    At the time Defendants and their co-conspirators made their misrepresentations, they knew of the health hazards and/or other risks posed by PFAS to the United States, the Department of Defense, and Plaintiff alike.

265.    There was great likelihood and/or certainty that serious harm would arise from Defendants' and their co-conspirators' misconduct, Defendants were aware of the likelihood of such harm, Defendants made profits from their and their co-conspirators' misconduct, and Defendants made no effort to disclose and/or remedy their PFAS pollution after discovery of their and their co-conspirators' misconduct.

## PRAYER FOR RELIEF

**WHEREFORE,** Highland Dairy prays for a judgment against these Defendants for:

1.    Highland Dairy is not asking for any equitable or injunctive relief, but compensatory damages only;

2.    Compensatory damages in an amount to be demonstrated and proven at trial but

which is:

  a. Above the jurisdictional minimum of this court on the First Cause of Action;

  b. Above the jurisdictional minimum of this court on the Second Cause of Action;

  c. Above the jurisdictional minimum of this court on the Third Cause of Action; and

  d. Above the jurisdictional minimum of this court on the Fourth Cause of Action;

  e. Above the jurisdictional minimum of this court on the Fifth Cause of Action;

  f. Above the jurisdictional minimum of this court on the Sixth Cause of Action; and

  g. Above the jurisdictional minimum of this court on the Seventh Cause of Action;

3. Punitive damages in an amount to be determined at trial;

4. Interest on the damages according to law;

5. Costs, disbursements and attorneys' fees of this lawsuit; and

6. Any other and further relief as the Court deems just, proper and equitable.

### JURY DEMAND

Plaintiff demands a trial by jury of all claims asserted in this Complaint.

Dated:  February 6th, 2019

**DOERR & KNUDSON, PA**

Randy Knudson, Esq.
212 West First Street,
Portales, New Mexico 88130
Tel: (575) 359-1289
Fax: (575) 359-1898
lawyers@yucca.net

-and-

**NAPOLI SHKOLNIK PLLC**

Paul J. Napoli, Esq. (*PHV Forthcoming*)

49

Louis R. Caro, Esq. (*PHV Forthcoming*)
Tate J. Kunkle, Esq. (*PHV Forthcoming*)
Patrick J. Lanciotti, Esq. (*PHV Forthcoming*)
360 Lexington Ave., 11th Floor
New York, NY, 10017
Tel: (212) 397-1000
Fax: (646) 843-7603
pnapoli@napolilaw.com
lcaro@napolilaw.com
tkunkle@napolilaw.com
planciotti@napolilaw.com